UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GERALD C. ELLIS, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|   vs. | ) | 1:06-cv-00366-RLY-TAB |
| | ) | |
| UNITED PARCEL SERVICE OF | ) | |
| AMERICA, INC., | ) | |
|     Defendant. | | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Gerald Ellis ("Plaintiff"), was a former employee of defendant, United Parcel Service of America, Inc. ("UPS"). Plaintiff was terminated by UPS for allegedly violating company policy by dating, and eventually marrying, a co-worker. Plaintiff claims that UPS' decision to terminate his employment violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and 42 U.S.C. § 1981 because it was based on Plaintiff's race (African-American) and because he is in an interracial relationship (his wife is Caucasian). UPS now moves for summary judgment on grounds that Plaintiff is unable to establish a prima facie case of race discrimination, and because Plaintiff is unable to establish pretext. The court, having reviewed the supporting and opposing memorandums of law submitted by the parties, the designated evidence, and the applicable law, now finds that UPS's motion should be **GRANTED**.

**I.      Summary Judgment Standard**

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992). The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003). The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-moving party may not, however, simply rest on the pleadings, but must demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Green v. Whiteco Industries, Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322).

## II. Background Facts

1. Plaintiff is an African-American male who was employed by UPS as a Hub Supervisor at its 81st Street Hub. (Deposition of Gerald C. Ellis ("Plaintiff Dep.") at 16).

### A. UPS's Non-Fraternization Policy

2. UPS has a policy prohibiting management employees (like Plaintiff) from dating UPS employees, which is referred to as the non-fraternization policy. One purpose of the policy is to prevent favoritism as well as the perception of favoritism. (Deposition of Lawrence Lewis ("Lewis Dep.") at 34 and Ex. 2; Deposition of Kenny Walker ("Walker Dep.") at 70 and Ex. 2).

3. The policy is memorialized in several locations. The most detailed explanation of the policy is on the UPS intranet and gives examples as well as options if a relationship does develop in spite of the prohibition on such relationships. The intranet site is "UPSers.com" and is accessible to all UPS employees. (Walker Dep. at 139-40 and Ex. 2; Lewis Dep. at 61-62 and Ex. 2).

4. The policy on UPSers.com expressly states that management employees are to "strictly avoid" romantic and dating relationships with other UPS employees:

   [A]ll employees are strongly discouraged from entering into close personal relationships including romantic, dating, and/or sexual relationships with coworkers. All management employees (including specialists) must strictly avoid entering into such personal relationships.

   (Lewis Dep. at 61-62 and Ex. 2; Walker Dep. at 139-40 and Ex. 2).

5. In instances where such relationships do develop and the employees want to continue the relationship, the policy provides:

> If the employees indicated that they plan to continue the relationship the following action will be taken. If one employee holds a management position, the individuals should be given the opportunity to choose which of them will voluntarily leave the company. If they are unable or unwilling to make this decision, the employment of the individual who holds the management position should be terminated.

(Walker Dep. at 79-81 and Ex. 2; Lewis Dep. at 61-62 and Ex. 2).

6. In addition to the policy on UPSers.com, a "Policy Book" given to each management person also references the non-fraternization policy. In the section on favoritism, the Policy Book states:

> For similar reasons, we discourage continuation of the full-time or part-time employment of any employee who marries another employee while either person holds a management position.

(Plaintiff Dep. at 60-61 and Ex. E; Walker Dep at 49-55, 136-38 and Exs. 1-3).

7. Each UPS district's human resources manager is charged with enforcing the non-fraternization policy. In January 2003, UPS provided the district human resources managers with a detailed memorandum explaining the policy and how to deal with employees who enter into relationships that violate the policy. (Walker Dep. at 54-55 and Ex. 3; Lewis Dep. at 36-37 and Ex. 3).

    **B.    Plaintiff Starts Dating UPS Employee Glenda Greathouse**

8. Plaintiff began dating UPS customer service clerk Glenda Greathouse ("Greathouse") in December 2000. (Ellis Dep. at 34, 36, 40; Deposition of Glenda

Greathouse ("Greathouse Dep.") at 15-16).

### C. UPS Learns of the Relationship

9. In February 2004, Plaintiff told Angela Wade ("Wade") that he was dating Greathouse. Wade, an African-American female, was both Plaintiff's friend and his manager at the time. (Deposition of Angela Wade ("Wade Dep.") at 4, 13-14, 20-21).

10. When Wade heard this, she knew the relationship implicated the non-fraternization policy and told Plaintiff he was "crazy" and could lose his job. She also told him that her manager, Derick Craft ("Craft"), needed to be informed of the relationship. (*Id*. at 20-22).

11. On February 10, 2004, Plaintiff and Wade went to speak to Craft regarding the relationship. (Wade Dep. at 33; Deposition of Derick Craft ("Craft Dep.") at 30).

12. Craft, like Plaintiff and Wade, is African-American. (Craft Dep. at 4, 8). In February 2004, Craft was a division manager for the UPS Hubs and supervised both Plaintiff and Wade. (*Id*. at 8-11).

13. During this February 10, 2004 meeting, Plaintiff confirmed to Craft that he was dating a UPS employee. Craft thereafter told him he would need to speak to Kenny Walker ("Walker"), the District Human Resources Manager. (Plaintiff Dep. at 53-54; Wade Dep. at 33; Craft Dep. at 31).

### D. Walker Counsels Plaintiff Regarding the Non-Fraternization Policy

14. After the February 10, 2004 meeting, Craft told Walker that Plaintiff was having a

relationship with someone in the customer service center. Craft did not tell Walker the name or race of the female employee. (Craft Dep. at 33; Walker Dep. at 56-57).

15. Plaintiff went to see Walker on February 11, 2004, as he had been directed by Craft. (Plaintiff Dep. at 58; Walker Dep. at 58).

16. Walker, like Craft, Wade and Plaintiff, is African-American. Walker was the Indiana District Human Resources Manager for UPS from July 15, 2003, to October 21, 2005. (Walker Dep. at 14, 21, 34).

17. In this meeting, Plaintiff admitted that he was dating Greathouse. (Plaintiff Dep. at 64).

18. Walker asked Plaintiff to find the reference to the non-fraternization policy in the Policy Book and to read it. Walker asked Plaintiff if he understood the policy, and Plaintiff said that he did. Walker also directed Plaintiff to handwrite the policy that he read. (*Id*. at 59-61 and Ex. G).

19. Walker testified that he counseled Plaintiff that he had to make a decision: end the relationship or have one of the two of them (Plaintiff or Greathouse) leave UPS. (Walker Dep. at 59, 66, 70).

20. Plaintiff testified that he was not given a choice for one of the two of them to leave UPS, but was told, instead, to simply end the relationship. (Plaintiff Dep. at 66).

21. Plaintiff later testified, however, that he discussed with Greathouse whether one of them should leave UPS. (*Id*. at 77) ("Q: Okay. And what did you say to Mrs.

Greathouse about this?  A: That possibly one of us would have to leave based off [sic] the policy.")).

22. At the conclusion of the meeting, Plaintiff gave Walker a written statement that read:

> I have talked with my Hub Manager Derick Craft and District H.R. Manager Kenny Walker today in regards to my relationship with Glenda Greathouse.  I understand that a decision on our relationship must be addressed.  As per my conversation with Derick I will have closure to this situation immediately in a timely manner.  I do have a plan to rectify the situation.  Kenny and I read and reviewed the Policy on "We Treat Our People Fairly and Without Favoritism."

(Plaintiff Dep. at 67-68 and Ex. F).

### E.    Plaintiff Marries Greathouse

23. On February 14, 2004, Plaintiff proposed marriage to Greathouse.  They were married two months later.  (*Id*. at 75, 91).

24. Both Plaintiff and Walker testified that marrying Greathouse was not one of the options that Walker gave Ellis in the February 11, 2004, meeting.  (Plaintiff Dep. at 71; Walker Dep. at 79).

25. Neither Plaintiff nor Greathouse invited anyone from UPS to the wedding, nor did they tell anyone from UPS that they were married.  (*Id*. at 96-97).

### F.    The July 2005 Termination Meeting

26. In July 2005, Walker saw Plaintiff at a concert behaving intimately with a woman.  Walker did not know who the woman was at the time.  (Plaintiff Dep. at 101-02; Walker Dep. at 89).

27. A few days later, Walker saw Plaintiff at work while Walker was walking with UPS Employee Relations Manager Brenda Baker ("Baker"). Seeing Plaintiff reminded Walker of the multiple public displays of affection he had seen at the concert, which led him to talk to Baker about it. Baker asked Walker to describe the woman. Following his description, Baker said that it was "probably" Greathouse. (Walker Dep. at 89; Deposition of Brenda Baker ("Baker Dep.") at 15-18, 22, 83-84).

28. Baker is African-American. (Baker Dep. at 36).

29. On July 21, 2005, Walker met with Plaintiff and asked him if the woman from the concert was the same woman they had discussed in February 2004. Walker then instructed Plaintiff to come to his office the next day. (Plaintiff Dep. at 103-05; Walker Dep. at 89-90, 96).

30. On July 22, 2005, Plaintiff reported to Walker's office. During this meeting, Plaintiff admitted that he was still dating Greathouse and that they were married. (Plaintiff Dep. at 107-08; Walker Dep. at 96-97).

31. Walker terminated Plaintiff's employment that same day for violating the non-fraternization policy and for dishonesty. (Walker Dep. at 102-03; Plaintiff Dep. at 109).

32. Walker reviewed his decision to terminate Plaintiff with Region Human Resources Manager Lawrence Lewis ("Lewis"), UPS in-house counsel and Indiana District Manager Robert Severson ("Severson") prior to his July 22, 2005, meeting with

8

Plaintiff.  (Walker Dep. at 91).

33. Lewis is African-American.  (Lewis Dep. at 21-22).

34. Lewis testified that disciplinary decisions are ultimately the district human resource manager's to make and that Lewis can only make a recommendation.  (*Id.* at 68, 80-82).

35. With regard to Plaintiff, Lewis confirmed that the decision to terminate was Walker's.  (*Id.* at 46-67, 70).

### G. Walker's Investigations of Other Alleged Instances of Fraternization

36. At a September 2005 Equal Employment Opportunity Commission ("EEOC") mediation, Plaintiff gave UPS a list of current management employees he claimed were in relationships that violated the non-fraternization policy.  (Walker Dep. at 36-39; Declaration of Kenny Walker ("Walker Dec.") ¶ 4).

37. Walker commenced an investigation which included interviewing the following individuals: Ann McKinley ("McKinley"), Pete Hood, Craft, Barry Miller, Lisa Clayton, and Tiffany Dial.  (Walker Dep. at 36-39 and Exs. 10-15; Lewis Dep. at 54; Walker Dec. ¶¶ 4-5).

38. Other than McKinley, who ended her relationship when it came to the attention of Walker in September 2005, each of the individuals interviewed denied being in a relationship that violated the non-fraternization policy and gave Walker a written statement to that effect.  Walker took each of the individuals interviewed at their word.  (Walker Dep. at 36-37, 108-14 and Exs. 10-15, 22; Lewis Dep. at 53).

9

39. Walker's policy is to accept the employee's denial of a relationship or take them at their word when they commit to end the relationship. Walker reasoned that "if they didn't [end the relationship], sooner or later something will turn up." (Walker Dep. at 109; Walker Dec. ¶ 11).

40. Walker resigned his employment in October 2005; therefore, he did not finish all the interviews. (Walker Dep. at 14-18; Lewis Dep. at 11-12, 18; Deposition of Robert Severson ("Severson Dep.") at 69).

41. Lewis recruited Region Workforce Planning Manager Gary Steck ("Steck") and Region Employee Relations Manager Jerry Collins ("Collins") to finish the interviews. (Lewis Dep. at 53-55).

42. As with Walker, each of the individuals interviewed, other than McKinley, denied a relationship that would violate the non-fraternization policy. (Declaration of Gary Steck ¶ 5; Declaration of Jerry Collins ¶ 5).

43. Any additional facts necessary to this opinion will be discussed in the next section.

## III. Discussion

A plaintiff can show that he was a victim of unlawful discrimination either by providing direct evidence or by proceeding under the indirect, burden-shifting method. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004). Under the direct method, the plaintiff may show, either through direct or circumstantial evidence, that the employer's decision to take the adverse job action was motivated by an impermissible purpose such as race. *Pafford v. Herman*, 148 F.3d 658, 665 (7th Cir. 1998). The

indirect, burden-shifting approach requires a plaintiff to first establish a prima facie case of discrimination. *Herron*, 325 F.3d at 299. To establish a prima facie case of race discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) his employer took an adverse employment action against him; and (4) his employer treated similarly-situated employees outside the protected class more favorably. *Id.*; *Foster v. Arthur Anderson, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999).

### A.     Direct Evidence

In this case, Plaintiff relies on direct evidence in opposing summary judgment on his discriminatory discharge claim. Direct evidence "requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000)).

The direct evidence Plaintiff cites are statements made by Baker and Craft in February 2004 regarding the fact that Plaintiff was dating a Caucasian woman. Neither Baker nor Craft, however, played any role in Walker's decision to terminate Plaintiff's employment. Indeed, Craft did not even work in the Indiana district at the time of Plaintiff's termination. (Craft Dep. at 8-10). As for Baker, she was never consulted by Walker or privy to any conversation regarding the termination decision; she was merely present as a witness during Walker's termination of Plaintiff. (Baker Dep. at 23-26). Accordingly, the remarks attributable to Baker and Craft are not direct evidence of

11

discrimination.

### B. Indirect Evidence

#### 1. Similarly-Situated Individuals

As Plaintiff has no direct evidence of discrimination, in order to survive the present motion, Plaintiff must present a prima facie case of race discrimination. The parties agree that Plaintiff has established the first three elements of his prima facie case. Thus, the only element in dispute is the fourth element – whether Plaintiff can show that similarly-situated employees outside of the protected class were treated more favorably.

In *Radue*, *supra*., the Seventh Circuit held that in disciplinary cases such as this, where a plaintiff claims he was disciplined more harshly than a similarly-situated employee based on some illegitimate reason:

> [the] plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

*Id*. at 617-18. "[A]n employee need not show complete identity in comparing himself to a similarly situated employee, but he must show substantial similarity." *Id*. at 618; *see also Humphries v. CBOS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (same).

Plaintiff attempts to expand the scope of allegedly similarly-situated individuals by arguing that Walker "was not the lone gunman of Human Resources" as he "acted in concert with many other UPS employees in terminating [Plaintiff]." (Plaintiff's Response

at 19). In support of this contention, Plaintiff cites to the testimony of Severson, which reads, in relevant part:

> Q: Specifically did you discuss with Mr. Walker what next steps would be taken?
>
> A: To follow the recommendations of our corporate legal team and region human resources.
>
> Q: So you told Mr. Walker to use whatever company resources you need and conduct whatever interviews you need?
>
> A: With the guidance of human resources and region and corporate counsel.
>
> Q: And then report back to me after your investigation?
>
> A: When everything was concluded.
>
> \* \* \*
>
> Q: So when he reported back to you, whenever it is, what did he tell you?
>
> A: That the group with corporate legal and Lawrence [Lewis] had decided that there was a problem.

(Severson Dep. at 17-19).

This testimony, coupled with Severson's earlier testimony that his only involvement were the updates on the situation he received from Walker and his suggestion that Walker speak with Lewis and legal counsel before taking any disciplinary action, fail to show that Severson was intimately involved in the decision to terminate Walker. (*See* Severson Dep. at 6-7, 15, 21, 25). As for Lewis, he testified that the ultimate decision was Walker's to make and that his role was merely advisory. (Lewis

13

Dep. at 46-47, 68, 70, 80-82). In light of these facts, the court finds that Walker made the ultimate decision to terminate Plaintiff's employment.

Even if Severson and Lewis were considered decision-makers in this case, Lewis could not have discriminated against Plaintiff since he did not know either Plaintiff's or Greathouse's race at the time Plaintiff was terminated. (Lewis Dep. at 69-70). Likewise, Severson did not know Greathouse's race when Plaintiff was terminated and, thus, could not have discriminated against Plaintiff due to an interracial relationship. (Severson Dep. at 66).

Having found Walker as the relevant decision-maker in this case, the court now turns to those who Plaintiff claims are similarly situated to him. These individuals, who are or were in UPS management during the relevant time period, include: Mac Kavanaugh ("Kavanaugh"), Gary Langston ("Langston"), Craft, Brandon Toney ("Toney"), Barry Miller ("Miller"), Angela Thompson ("Thompson"), and McKinley. As shown below, none of these individuals meets the similarly-situated standard.

With respect to Kavanaugh and Langston, neither individual was dating a UPS employee at the time that Walker arrived in July 2003. (Deposition of Gary Langston at 42-45, 53; Lewis Dec. ¶ 6). Thus, they are incapable of being similarly situated to Plaintiff because any allegation that someone else knew about their relationships prior to their female partners' resignations implicates a decision-maker other than Walker. *See Radue*, 219 F.3d at 616-17.

With respect to Craft, Plaintiff fails to support his charge that Craft engaged in an

14

inappropriate relationship with a UPS employee with competent evidence. Indeed, Plaintiff's sole basis for arguing that such a relationship existed is Wade's testimony that she thought there might be something going on between Craft and the UPS employee because of a situation she heard second hand from another supervisor. (Wade Dep. at 88-93). Wade admitted she had no personal knowledge that such a relationship existed. (*Id*. at 88-89). Plaintiff even charges that Walker himself engaged in an inappropriate relationship with Baker. However, he testified that he had no personal knowledge of the alleged affair, and only learned of the alleged relationship through the rumor mill. (*See* Plaintiff Dep. at 161).

This leaves Toney, Miller, Thompson, and McKinley – UPS employees who were under Walker's management during the relevant time period. With respect to Toney and Miller, there is no evidence in the record that Walker had knowledge that these UPS employees were involved in extra-marital affairs with female UPS employees. (Walker Dep. at 14, 134; Walker Dec. ¶ 10). It is axiomatic that the decision-maker – in this case, Walker – must have knowledge of a rule violation by those to whom the plaintiff seeks to compare himself. *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1366 (7th Cir. 1988) (summary judgment for employer because comparable transgressions are irrelevant if the decision-maker does not know about them); *Friedel v. City of Madison*, 832 F.2d 965, 974 (7th Cir. 1987) (the "mere belief, without any factual support," that the decision-maker knew about other comparable transgressions does not establish a genuine issue of material fact). As there is no evidence to contradict Walker's testimony that he was

unaware of Miller's and Toney's affairs, Plaintiff cannot show that either individual was treated more favorably. *See Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60 (2d Cir. 1997) (summary judgment for employer where plaintiff claimed it was common knowledge that other individuals had relationships that violated the non-fraternization policy, but plaintiff lacked personal knowledge of it).

This leaves Thompson and McKinley. The evidence shows that when Walker learned that Thompson married a UPS mechanic, Walker informed Thompson that either she or her husband needed to resign their UPS employment. When Thompson refused, Walker terminated her employment. (Walker Dep. at 41-43, 116-17 and Ex. 17). Plaintiff attempts to distinguish his case from Thompson's by arguing that there was more cause to terminate Thompson as Thompson's job may have allowed her to impact her husband's schedule, work hours, etc. This argument ignores the fact that UPS' non-fraternization policy does not take into account such considerations. The policy precludes management from having an intimate relationship with other UPS employees, regardless of whether there is a direct or indirect supervisory relationship between the two individuals.

With respect to McKinley, when Walker learned that McKinley was dating a UPS mechanic, Walker informed her of her options: either to end the relationship or resign. She opted to end the relationship. (Walker Dep. at 108-11 and Ex. 11). Plaintiff attempts to distinguish his case from McKinley's by arguing that Walker merely "took [McKinley] at her word," but did not do the same for Plaintiff. This argument ignores the fact that Walker did not conduct an investigation, interview people or do anything else to

16

corroborate Plaintiff's representation that he would end his relationship with Greathouse. (Walker Dep. at 31-32, 76-77). This is corroborated by the fact that it took Walker 17 months to discover that Plaintiff did not actually end the relationship. And that discovery was due to the pure chance of Walker happening to have seats at a concert that were several rows behind Plaintiff and learning several days later that the woman Plaintiff was with was Greathouse.

Plaintiff also attempts to distinguish his case from McKinley's by arguing that, unlike McKinley, he was not given the choice between ending the relationship or having either he or Greathouse resign. This argument is belied by Plaintiff's written statement from the February 2004 meeting with Walker in which he acknowledged that he had a choice to make, and by his own deposition testimony, where he testified:

> Q: You testified that Kenny Walker in that meeting told you you need to end the relationship, right?
>
> A: That's what he said.
>
> Q: Okay. Why did you then turn around and propose marriage?
>
> A: Can't tell me what to do; can't tell me who I can date. No one can.
>
> Q: Did you – why didn't you take the other option and have one of you leave the company?
>
> A: I don't know.

(Plaintiff Dep. at 77).

As Plaintiff has failed to establish that he is similarly situated to other UPS employees who engaged in similar conduct but were treated more favorably, the court

17

finds that Plaintiff is unable to establish a prima facie case of race discrimination.

### 2. Pretext

Even if Plaintiff established his prima facie case of race discrimination, UPS would still prevail. That is because Plaintiff is unable to show that UPS' asserted reason for terminating his employment – i.e., violating the non-fraternization policy – is a pretext for discrimination.

The pretext inquiry assesses the reasons given by the employer for the adverse employment action. Significantly, the pretext inquiry does not address the issue of whether the employer's decision was correct, appropriate, or fair; instead, the inquiry "'addresses the issue of whether the employer honestly believes in the reasons it offers.'" *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323 (7th Cir. 2001) (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).

Plaintiff's pretext argument relies on both direct and indirect evidence. Plaintiff's direct evidence – i.e., the comments made by Baker and Craft – were previously rejected by the court, and are thus irrelevant to this inquiry.

Plaintiff's indirect evidence consists of his claim that management was aware of inappropriate relationships amongst UPS employees but turned a blind eye to them because the relationships were between single-race couples. The UPS employees he refers to were discussed above and are distinguishable from his case in all material respects.

Plaintiff also seeks to raise an inference of discrimination by arguing that he

18

genuinely thought that marrying Greathouse "remedied" the situation. Plaintiff admitted in his deposition, however, that he had not thought of marrying Greathouse as an option during the February 2004 meeting with Walker and that this was not the decision he referenced in his written statement. (Plaintiff Dep. at 79-80). Plaintiff also admitted that marrying Greathouse was not one of the options posed to him by Walker. (Plaintiff Dep. at 71). Finally, Plaintiff never informed Walker of his idea to remedy the situation by marrying Greathouse. (Plaintiff Dep. at 71-73). Thus, Plaintiff's contention that he thought that marrying Greathouse remedied the situation is belied by his own testimony.

Plaintiff's argument that UPS management is generally confused regarding the non-fraternization policy is equally without merit. While several of the UPS employees deposed did not know that a detailed version of the non-fraternization policy was on UPSers.com, each of these witnesses testified that they understood the policy to prohibit management from dating another UPS employee. (Wade Dep. at 14; Craft Dep. at 26, 28; Deposition of Thomas Miller at 12-13; Deposition of Melvin Hall at 10-11; Deposition of Ronald Fresh at 15-16; Deposition of Garry Frick at 17-18).

As discussed above, Plaintiff is unable to show that UPS's asserted reason for terminating his employment was a pretext for discrimination. UPS is therefore entitled to judgment as a matter of law on Plaintiff's race discrimination claim.

## IV.  Conclusion

For the reasons set forth above, the court hereby **GRANTS** UPS's Motion for Summary Judgment (Docket # 73).

**SO ORDERED** this <u>12th</u> day of July 2007.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Nelson D. Alexander
LOCKE REYNOLDS LLP
nalexander@locke.com

Gary R. Clark
QUARLES & BRADY, LLP
gclark@quarles.com

Edward O'Donnell DeLaney
DELANEY & DELANEY LLC
ed@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

John Allen Klages
QUARLES & BRADY LLC
jk2@quarles.com

Jacquelyn T. Pinnell
QUARLES & BRADY LLP
jpinnell@quarles.com

W. Russell Sipes
LAUDIG GEORGE RUTHERORD & SIPES
wrsipes@lgrslaw.com